**AT & T WIRELESS SERVICES OF CALIFORNIA LLC, a Delaware Limited Liability Company, D/B/A AT & T Wireless, Plaintiff,**

v.

**CITY OF CARLSBAD, et al., Defendants.**

**No. 01 CV 2045 JM(LAB).**

United States District Court, S.D. California.

Feb. 3, 2003.

---

Michael A Attanasio, Cooley Godward, San Diego, CA, Jeremy H Stern, Cole Raywid and Braverman, El Segundo, CA,

**1152**

Adam Caldwell, Edward L Donohue, Cole Raywid and Braverman, Washington, DC, for AT & T Wireless Service of California, LLC, a Delaware Limited Liability Company dba AT & T Wireless, plaintiff.

Ronald R Ball, City of Carlsbad, City Attorneys Office, Carlsbad, CA, Roberta R Sistos, Burke Williams and Sorensen, San Diego, CA, for City of Carlsbad, City Council of the City of Carlsbad, The City Council of the City of Carlsbad, Claude A Lewis, in his Official Capacity as a member of the City Council, Ann J Kulchin, in her Official Capacity as a member of the City Council, Ramona Finnila, in her Official Capacity as a member of the City Council, Matt Hall, in his Official Capacity as a member of the City Council, Julianne Nygaard, in her Official Capacity as a member of the City Council, City of Carlsbad, Planning Commission, Jeff Segall, in his Official Capacity as a member of the Planning Commission, Bill Compas, in his Official Capacity as a member of the Planning Commission, Ann L'Heureux, in her Official Capacity as a member of the Planning Commission, Courtney Heineman, in her Official Capacity as a member of the Planning Commission, Julie Baker, in her Official Capacity as a member of the Planning Commission, Seena Trigas, in her Official Capacity as a member of the Planning Commission, Robert Neilsen, in his Official Capacity as a member of the Planning Commission, defendants.

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION AND CROSS–MOTION FOR SUMMARY ADJUDICATION; DENYING DEFENDANTS' CROSS–MOTION FOR SUMMARY ADJUDICATION**

MILLER, District Judge.

## I. INTRODUCTION

Plaintiff AT & T Wireless ("ATT") (successor in interest to GTE) has filed suit under, *inter alia,* section 704 of the Telecommunications Act of 1996 ("TCA") (47 U.S.C. § 332(c)(7)) alleging that the City of Carlsbad, as well other city employees acting in their official capacities, (cumulatively the "city") unlawfully denied ATT's application for Conditional Use Permit ("CUP") No. 00–36. ATT requested the CUP in order to place a "stealth" wireless antenna site on residentially zoned property located at 7512 Cadencia Street. The key issue for purposes of the pending motions,[1] is whether the city's findings denying ATT's application for CUP No. 00–36 are supported by substantial evidence in the administrative record and were not impermissibly based on public concern over the health effects of radio frequency ("RF") emissions from the site in violation of the TCA. Pursuant to Local Rule 7.1(d)(1), the court finds these motions appropriate for decision without oral argument.

---

1. The parties have filed cross motions for summary adjudication on counts one and three, and plaintiff has filed a motion for summary adjudication on counts seven through ten. Neither party seeks summary adjudication on counts four, five, and six. The claims for which summary adjudication is sought are as follows: (1) count one 47 U.S.C. § 332(c)(7)(B)(iv)prohibition on denying permit to construct a cell site based upon RF emissions; (2) count two 47 U.S.C. § 332(c)(7)(B)(i)(I)-prohibition on unreasonable discrimination between cellular providers; (3) count three 47 U.S.C. § 332(c)(7)(B)(iii)requirement of substantial evidence for denying cell site application; (4) count seven procedural due process under California and federal constitutions; (5) count eight equal protection under California and federal constitutions; (6) count nine 42 U.S.C. § 1983; (7) count ten-Cal. Code Civ. Proc. § 1094.5–administrative mandamus.

## II. BACKGROUND

In early 2000, GTE applied for a conditional use permit ("CUP") in order to place a wireless personal service facility ("cell site" or "wireless site") on San Diego Gas and Electric's Tower 173. A cell site at that location would have allowed GTE to fill its cellular service coverage gap at the eastern end of the La Costa Valley (i.e., Cadencia gap) and along Santa Fe road. The city, however, denied GTE's application thereby forcing ATT (GTE's successor in interest) to replace the proposed Tower 173 site with two separate sites: one site to cover the Cadencia coverage gap and a second site to cover the remaining portions of the gap on Rancho Santa Fe Road.[2] To cover the Cadencia gap, ATT submitted CUP application No. 00–36 for a cell site at 7512 Cadencia Street; the site would include six antennas and a radio base station to be housed on the privately owned property.[3] The antennas and base station were designed to look like part of the existing house: four antennas would be placed on the two existing chimneys with the remaining two antennas built into a fake third chimney designed to look like the existing chimneys; the radio base station would be housed in a 400 square foot extension to the existing 800 square foot garage.[4] This design was modeled on a very similar cell site owned by Pacific Bell ("Pac Bell") located on a house a block away from ATT's proposed site for which the city had previously granted Pac Bell a CUP. Like the Pac Bell site, ATT's antennas were designed to be embedded in the chimney, and thus invisible to the eye, with the only difference between the two sites being that Pac Bell's radio equipment was housed on wall-mounted cabinets on the back of the house rather than being enclosed in a fake garage.[5]

*Planning Commission Hearing*

On May 16, 2001, the planning commission hearing on ATT's application was held. Christer Westman, the city planner on this application, recommended that the planning commission approve ATT's application and supported the recommendation with findings of the planning department. Specifically, the department found the site (1) had no aesthetic effects as it could not be distinguished from being a part of the house, (2) would only require one to two trips per month by ATT to maintain, (3) did not create noise that would intrude into the neighborhood, and (4) lacked any environmental impact.[6] Westman also stated in a prior report that the General Plan recognized that "that these types of facilities are necessary and essential to the infrastructural support of urban land uses."[7] Sixteen residents testified in opposition to the application, ten of whom expressed concerns over the health effects that RF emissions could cause, notwithstanding the residents having been informed that the planning commission could not base its decision on such concerns.[8] Residents also testified to concerns about aesthetics, whether alternative sites had been considered, and over the area becoming "antenna alley."[9] Of the two residents who raised aesthetic concerns, only Jon

---

2. AR, p. 106; 108.

3. AR, p. 468, 345.

4. AR, pp. 417, 628–635.

5. Plaintiff's Motion for Summary Adjudication on Counts II and VII to X, Ex. 4, p. 1.

6. AR, Part IX, pp. 3, 64–64. The planning department report also contained the statement that there were no feasible alternatives because, as the city planner stated before the planning commission, the planning department accepted the applicants verbal representations that there were no feasible alternatives. AR, p. 346; Part IX, p. 64.

7. AR, p. 346.

8. AR, pp. 108–114; Part IX, pp. 30–62.

9. AR, Part IX, pp. 30–62.

Nerenberg testified that the aesthetics of the project bothered him since it would extend the garage closer to his house.[10] In addition, more than one resident expressed concern over property values decreasing based on possible health effects from the cell site's RF emissions.[11] The planning commissioners, while stating that they could not consider the possible health effects caused by RF emissions, did ask the applicant and the city planner about such emissions from the proposed facility.[12] Ultimately, the planning commission denied the application on the expressed concerns of the residents (e.g., aesthetics, commercialization, decrease in property values, etc.) resulting in ATT's appeal to the city council.

*City Council Hearings*

On August 21, 2001, the first city council meeting was held regarding ATT's proposed cell site. When the city council opened the hearing to public comment, Ms. Horen, who was the lead resident at both the city council and planning commission hearings, testified about concern over the unknown cumulative health effects caused by RF emissions from the proposed cell site, the Pac Bell site, and ham radio in the neighborhood. In response, the mayor requested the city attorney's legal advice on whether such emissions could be consid-

ered since he thought the planning commission had considered the RF emissions in denying the application.[13] The city attorney responded by stating that the city could not consider the RF emissions to the extent they did not exceed the parameters set by the Federal Communications Commission ("FCC").[14] When the mayor then asked certain residents about aesthetic concerns, the response was that there was a "philosophical" opposition to the aesthetics of the additions and that the additions could not be made out from the road due to the property's elevation.[15] The decision on the appeal was delayed because the mayor wanted further information concerning the RF emissions from the Pac Bell site stating that if the emissions were anywhere near negative (presumably in comparison to the FCC guidelines) he would oppose ATT's application, but if positive would vote for approval.[16]

In the interim, the mayor received a number of letters, from people who did not testify either before the city council or planning commission, largely stating that they were opposed to ATT's application due to the unknown health effects and asking why alternate sites could not be explored.[17]

At the next and final hearing on September 18, 2001, the mayor voted to deny

**10.** One other resident besides Jon Nerenberg expressed aesthetic concerns, yet his concerns dealt with the aesthetics of green utility boxes added along the sidewalk to accommodate cell sites; however, ATT stated in response that its site definitely did not require such a box. AR, Part IX, pp. 53–55, 77. In addition, other residents expressly stated that aesthetics were not a problem because the additions were "in a house similar to what we all live in." AR, Part IX, pp. 40, 49.

**11.** One planning commissioner expressly relied on the concern over decrease in property values due to the possible health effects of RF emissions in voting against the application. AR, Part IX, pp. 43, 47, 82.

**12.** AR, Part IX, 4:6–17, 25:9–23, 69–70.

**13.** AR, Part VII, pp. 21–22.

**14.** AR, Part VII, pp. 21–22.

**15.** AR, Part VII, pp. 19, 23–24. Mr. Nerenberg again stated his opposition based on aesthetics, *supra.*

**16.** AR, Part VII, p. 43. The city also requested a study on the combined RF emissions from the proposed ATT site and the existing Pac Bell site. AR, pp. 244–250.

**17.** AR, pp. 149–158.

the application, even though the Pac Bell emissions were one percent of the allowed emissions under FCC guidelines. The mayor based his vote on concerns over more cell sites being located in the neighborhood and the lack of city guidelines on the issue.[18] The council ultimately denied ATT's appeal by a three to two vote. The mayor closed the hearing by stating the need for a report on what the city can and cannot legally do regarding cell site applications and added "I have a real problem with violating the rules ... but I think there are rules and there are certain things you have to look at as far as what is best for our community in general."[19]

On October 3, 2001, after the final hearing, but before the written resolution, Carlsbad Policy No. 64 was "adopted."[20] The city expressly incorporated policy No. 64 in its resolution denying ATT's CUP application requiring that ATT seek "guidance" from the policy in making a new application for a cell site. ATT responded by filing this action and bringing two separate motions for summary adjudication: (1) on counts one and three, to which the city filed a cross-motion; and (2) on counts two and seven through ten.

## III. DISCUSSION

### A. Legal Standards on Summary Judgment

■ A court may grant summary judgment when there are no genuine issues of material fact and the party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986); *Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 919 (9th Cir.2001). Additionally, summary adjudication is appropriate on discrete claims where no genuine issues of material fact exist as to that claim. Fed.R.Civ.P. 56(a). Furthermore, a claim alleging a lack of substantial evidence for a zoning decision in violation of the Telecommunications Act of 1996 ("TCA") is especially amenable to decision at summary judgment since the court's only role is to determine if substantial evidence exists within the administrative record that would support the zoning decision. *See, e.g., Cellular Telephone Co. v. Town of Oyster Bay,* 166 F.3d 490, 495, 497 (2d Cir.1999) (affirming grant of summary judgment where district court reviewed administrative record for substantial evidence under the TCA); *National Tower, LLC v. Plainville Zoning Board of Appeals,* 297 F.3d 14, 22 (1st Cir.2002) (under TCA substantial evidence claim, court merely reviews administrative record to determine if evidence exists to support a reasonable conclusion); *Airtouch Cellular v. City of El Cajon,* 83 F.Supp.2d 1158, 1164 (S.D.Cal.2000) (granting summary judgment on substantial evidence claim under TCA based on review of administrative record).

### B. Motion to Exclude Kramer as City's Expert

Prior to addressing the merits of the motions, the court addresses ATT's motion in limine to exclude the testimony of the city's sole expert, Jonathan Kramer, on the issue of the alleged suitability of several alternative locations for ATT's proposed facility.[21]

---

**18.** AR, Part VI, pp. 6, 16. The city requested that Pac Bell provide it with a study of its RF emissions and requested a study of the combined RF emissions from the FCC. AR,

**19.** AR, Part VI, p. 18.

**20.** The city argues that Policy No. 64 was not adopted on this date, but rather merely put into writing since it had, allegedly, existed throughout the application process by ATT, see discussion *infra.*

**21.** Kramer had been designated to also testify on the due diligence of plaintiff under indus-

 The admissibility of expert witness testimony is governed by Federal Rule of Evidence ("FRE") 702 which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. In the watershed case of *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court established that the trial court must act as a gatekeeper to prevent "junk science" from entering the courtroom in the guise of "expert" testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). While the trial judge's inquiry under FRE 702 does not focus on the conclusions generated by expert witness testimony, the trial judge's duty is to ensure that the scientific principles that underlie the conclusions are both relevant to the issue at hand and reliable. *Id.* at 595, 113 S.Ct. 2786. Additionally, the Supreme Court recently held in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), that the principles established in *Daubert* apply with equal force to expert testimony which is based upon experience and training rather than on science per se. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (holding that FRE 702 applies to all offers of expert witness testimony requiring that the trial court determine the reliability and relevance of the offered submissions); *See also* Fed.R.Evid. 702, Advisory Committee Notes (2000 Amendments) ("amendment affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony.").

 In any event, expert testimony, whether experience based or strictly scientific, must be reliable. As explained by the Ninth Circuit, where the expert opinion is not a product of independent research unrelated to the current lawsuit, "the party proffering it must come forward with other objective, verifiable evidence that the testimony," is reliable. *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317–18 (9th Cir.1995) ("*Daubert II*") (Ninth Circuit opinion on remand from *Daubert v. Merrel Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)); *see also, Cabrera v. Cordis*, 134 F.3d 1418, 1422–23 (9th Cir.1998) (holding expert testimony properly excluded under *Daubert* where testimony was prepared solely for litigation, lacked any supporting research, and there was no showing of support for witness' conclusions in peer-review articles or any outside research); Fed.R.Evid. 702, Advisory Committee

---

try custom in seeking alternative sites. However, due to the city's violation of the court's discovery order, a sanction was imposed on the city such that Kramer's testimony, even if allowed, is limited to the opinions and statements rendered in his tentative report and in his August 27, 2002 deposition. *See Order Granting in Part Plaintiff's Motion for Discovery Sanctions*, November 6, 2002. Consequently, the court only considers whether Kramer's testimony as stated in the tentative report and his August 27, 2002 deposition is reliable and relevant. Lastly, because the tentative report and deposition testimony do not address industry custom in performing due diligence, the court looks only at whether Kramer's testimony is admissible on the issue of the suitability of alternative sites.

Notes (2000 Amendments) (party putting forward expert has the burden of proving by a preponderance of the evidence that the testimony is reliable and relevant) (*citing Bourjaily v. U.S.*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)). In determining if objective, verifiable evidence supports the expert's testimony, the court may consider whether the methods used to generate the expert opinion have been subjected to peer review and publication; whether the technique can be tested; the known potential rate of error; and whether the expert's methodology is generally accepted within his or her field of expertise. *See Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786.

■ In this case, even assuming Kramer is a qualified expert in radio frequency engineering, the city has failed to show by a preponderance of the evidence that Kramer's conclusions in the tentative report and in his August 27, 2002 deposition are reliable. First, the city does not present any evidence that Kramer's testimony and conclusions resulted from independent research unconnected with this case. Rather, the city hired Kramer with the express purpose that he study ATT's technical requirements and reach conclusions about possible alternative locations for ATT's wireless phone site.[22] Second, the city admits that Kramer's conclusions about possible alternative sites were based solely on a comparison of the documents provided him by ATT and his physically visiting potential alternative sites. While Kramer opines on the availability of potential alternative sites in light of ATT's coverage goals and search ring,[23] Kramer never presents any objective criteria by which the court may evaluate his opinion. This finding is reinforced by Kramer's deposition testimony where Kramer states the basis for his conclusions that other cell sites were potentially available: "it is clear to an expert that these were potential sites that bear full investigation."[24] What is notably lacking, despite the city's assertion to the contrary, is any evidence that explains for the court how the review of the documents allowed Kramer to conclude the availability of alternative sites. Consequently, the reliability of Kramer's conclusions are seriously compromised, and the court accords the conclusions virtually no weight at all.

---

**22.** The city presents a somewhat confusing argument on exactly what purpose Kramer's testimony was to serve in this case. The city designated Kramer as an expert on two issues:

(a) That suitable locations other than 7512 Cadencia exist for placement of AT & T's wireless facility; and,

(b) AT & T fell below the customary standard in conducting a due diligence investigation for suitable locations other than 7512 Cadencia.

*See* Defendants' Designation of Expert, 2:4–10. The city concedes that Kramer will not give an opinion on the second matter, yet states in its brief that Kramer "was not retained as an expert to find alternative sites, but to opine on the quality of ATTW's search for alternative sites." Defendants' Opposition to Plaintiff's Motion to Exclude Kramer, 7:1–3. Thus, the city appears to make contradictory statements as to the purpose of Kramer's testimony. Furthermore, the tentative report issued by Kramer specifically makes conclusions about the best site and other alternative sites for ATT's wireless facilities. Jystad Decl. in Support of Plaintiff's Motion to Exclude, Ex. 13, pp. 7–8. As such, Kramer's testimony does, in fact, focus on finding potential alternative sites.

**23.** A "search ring" is the area mapped out by the wireless phone service provider within which the provider has determined a wireless site is needed to provide cell phone service or "coverage."

**24.** Defendants' Opposition to Plaintiff's Motion to Exclude, Ex. B, 35:15–36:5.

*C. Did the City Impermissibly Base its Decision to Deny ATT's Application on Concerns about the Health Affects from Radio Frequency Emissions in Violation of 47 U.S.C. § 332(c)(7)(B)(iv) or Does Substantial Evidence Support the Decision?* [25]

### Burden of Proof

█ Under the TCA, Congress explicitly requires local governments to state in writing any denial of a request to place or construct a personal wireless service facility and base the decision on substantial evidence in a written record.[26] An initial issue raised in the briefs is which party has the burden of proof for establishing that the decision is or is not supported by substantial evidence. Given the text and legislative history of the TCA, the court concludes that Congress intended that the permit applicant bear the burden of showing a lack of substantial evidence for the decision.[27] Under § 332(c)(7)(A), Congress makes clear that nothing in the TCA is meant to preempt local government's ability to exercise its traditional zoning authority in regulating the placement of cell sites except for the specific limitations stated in § 332(c)(7). One of the requirements Congress placed on government in this regard is to predicate the denial of a permit upon a written decision supported by substantial evidence. This has been the standard for review of government zoning in California for some time. *See, e.g., Harris v. City of Costa Mesa,* 25 Cal.App.4th 963, 969, 31 Cal.Rptr.2d 1 (1994) (applying substantial evidence standard to the denial of plaintiff's application for a conditional use permit). The TCA simply extends the substantial evidence standard traditionally applied by state law. This legislative intent is clearly reflected in the legislative history of the TCA which provides " 'substantial evidence contained in a written record' is the traditional standard used for judicial review of agency actions." H.R. Conference Report No. 104–458, p. 201 (1996). Given Congress's adoption of the traditional substantial evidence standard and the explicit statement that local government continue to generally exercise its traditional zoning authority, the court finds, in the absence of contrary authority or persuasive argument, that

---

**25.** This section discusses the cross-motions on counts I and III jointly since the key issue is whether or not substantial evidence exists to support the city's findings denying ATT's permit application.

**26.** Section 704 of the TCA states in relevant part:

Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

47 U.S.C. § 332(c)(7)(B)(iii).

**27.** The Second Circuit recently noted, without deciding, that a split among district courts exists over whether the applicant or local government bears the burden of proof as to whether substantial evidence exists. *Cellular Telephone Co. v. Town of Oyster Bay,* 166 F.3d 490, 496–97 (1999). However, the district courts, noted by the Second Circuit, that placed the burden on the government to establish substantial evidence did so either with no reasoning or simply by citing reasoning from an Iowa state court decision that found the TCA preempted state law which placed the burden of proof on the applicant to show the lack of substantial evidence. *See, e.g., Sprint Spectrum L.P. v. Town of Easton,* 982 F.Supp. 47, 49 (D.Mass.1997) (*citing United States Cellular Corp. v. Board of Adjustment of City of Des Moines,* Polk County District Court, LACL No. CL 00070195 (Iowa District Court for Polk County, January 2, 1997)). However, TCA preempted local zoning authority only in a limited number of areas and the burden of proof was not included in any such limitation. Therefore, to find that the TCA preempts the traditional placement of the burden of proof on the applicant contravenes the text and history of § 332(c)(7) as discussed above.

Congress intended to place upon the applicant in a case such as this the burden of establishing a particular decision is unsupported by substantial evidence.

### Substantial evidence

 As has oft been repeated, substantial evidence "mean[s] less than a preponderance, but more than a scintilla of evidence." *Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir.1999) (applying substantial evidence standard under the TCA); *see also, Cellular Telephone Co. v. Zoning Bd. of Ho–Ho–Kus*, 197 F.3d 64, 71 (3d Cir.1999) (citations omitted) (same). In other words, substantial evidence " 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Oyster Bay*, 166 F.3d at 494 (*quoting Universal Camera v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). Under this standard, the court may not consider evidence outside the administrative record nor overturn reasonable determinations by the local authority even if evidence to the contrary exists. *Id.* However, in applying the substantial evidence standard, the court applies common sense and need not "accept as substantial evidence impossible, incredible, unfeasible, or implausible testimony." *Airtouch Cellular v. City of El Cajon*, 83 F.Supp.2d 1158, 1164 (S.D.Cal.2000) (applying the substantial evidence standard under 47 U.S.C. § 332(c)(7)(B)(iii)). Additionally, the court reviews the entire record in determining if substantial evidence exists including evidence which contradicts the findings. *Zoning Bd. of Ho–Ho–Kus*, 197 F.3d at 71; *Oyster Bay*, 166 F.3d at 494.

 In this case, application of the substantial evidence standard is tempered by the limitations in the TCA that prohibit local government from denying an application to construct a cell site based upon the environmental effects of radio frequency ("RF") emissions from the proposed wireless site:

> No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the [Federal Communication] Commission's regulations concerning such emissions.

47 U.S.C. § 332(c)(7)(B)(iv). Significantly, the conference report on the TCA, adopted by Congress, makes clear that local government may not indirectly base its decision to deny an application to place a cell site upon concern over the environmental effects of RF emissions:

> The conferees intend section 332(c)(7)(B)(iv) to prevent a State or local government or its instrumentalities from basing the regulation of the placement, construction, or modification of CMS facilities *directly or indirectly* on the environmental effects of radio frequency emissions if those facilities comply with the Commission's regulations . . .

H.R. Conference Report No. 104–458, 201 (1996) (emphasis added). Given this legislative history, the court concludes that concern over the decrease in property values may not be considered as substantial evidence if the fear of property value depreciation is based on concern over the health effects[28] caused by RF emissions. Thus, direct or indirect concerns over the health effects of RF emissions may not serve as substantial evidence to support the denial of an application. Accordingly, when public testimony in the record "is almost ex-

---

**28.** *Cellular Telephone Co. v. Town of Oyster Bay,* 166 F.3d 490, 494 n. 3 (2d Cir.1999) (holding statutory terms "concern over environmental effects" from RF emissions included concern over health effects caused by such emissions).

clusively directed to health effects, there must be substantial evidence of some legitimate reason for rejecting the applications to avoid the conclusion that the denials were based on the impermissible health effects ground." *Oyster Bay*, 166 F.3d at 495 (*citing Iowa Wireless Servs. L.P. v. City of Moline, Illinois*, 29 F.Supp.2d 915 (C.D.Ill.1998)). In this case, then, the court must examine the proffered findings to determine if (1) they are based on legitimate concerns and (2) substantial evidence supports those concerns.[29]

The city makes a number of arguments that substantial evidence supports legitimate findings. Generally, the findings alleged to support the city's decision can be placed into the two following categories: (1) lack of compatibility with the surrounding neighborhood; and (2) lack of evidence presented to the council about the unavailability of alternative sites.

*Lack of Compatibility with the Neighborhood*

The city argues that substantial evidence supports the findings that placing the cell site in the neighborhood would be in conflict with the character of the area because of aesthetic concerns, possible decline in property values, and an intensification of uses due to the fact that another cell site exists about a block away. However, after reviewing the administrative record as a whole, these findings are not supported by substantial evidence.

The public testimony before both the planning commission and city council emphasized community concern over the health effects of the RF emissions.[30] Additionally, the record is replete with letters to the planning department, planning commission, and Mayor Lewis, objecting to the application based upon possible health effects caused by RF emissions and questioning why the site cannot go elsewhere.[31] This fact is further emphasized by the mayor's statement at the city council hearing that while the planning commissioners stated they were not considering the health affects of RF emissions in denying ATT's permit application, purportedly following the city attorney's advice as stated at the hearing, this is exactly what they did.[32] While the city may undoubtedly hear residents' concerns over the health effects of RF emissions, such concerns do not constitute a legitimate basis to deny an application. Substantial evidence must otherwise exist in support of a legitimate basis for an application denial to avoid the conclusion that the city denied the permit due to impermissible health concerns. *Oyster Bay*, 166 F.3d at 495.

29. The court acknowledges that its role is not to divine the intent of the council members in making their decision, but rather to look at the administrative record to see if substantial evidence exists. *See City of Fairfield v. Superior Court*, 14 Cal.3d 768, 772, 122 Cal.Rptr. 543, 537 P.2d 375 (1975) (holding plaintiff cannot depose council members about the intent in making a decision to deny a use permit application because such information is irrelevant to whether the decision was supported by substantial evidence). However, the court considers council members' statements at the various hearings since such statements are part of the administrative record before the court. *See Harris v. City of Costa Mesa*, 25 Cal.App.4th 963, 971, 31 Cal. Rptr.2d 1 (1994) (where in reviewing the rec-

ord for substantial evidence to support the denial of a conditional use permit the court stated, "In addition to the findings stated in the council's resolution, we look to the transcript of the hearing for statements made by the council members. It is proper to look for findings in oral remarks made at a public hearing at which both parties were present, which was recorded and of which a written transcript could be made.") (quotations and citation omitted).

30. AR, Part IX, pp. 30–60; Part VII, pp. 15:2–17:11, 19:23–20:4.

31. AR, pp. 148–158, 406–416.

32. AR, Part VII, pp. 21–22

The first basis raised to support the denial is aesthetics, yet no reasonable person could find credible and substantial evidence supports such a finding. Rather, a review of the record as a whole leads to the conclusion that aesthetics were raised because it was known, after repeated instruction by city attorneys, that basing the decision on health concerns would be unlawful.[33] For example, before the planning commission Ms. Horen and Ms. Dice testified that they were opposed to the site because of possible health effects; Ms. Horen said nothing about aesthetics and Ms. Dice stated that the appearance is acceptable but that she was concerned over the commercial facility being disguised as a residence.[34] In fact, when aesthetic concerns were discussed at both the planning commission and city council hearings, only one person, Mr. Nerenberg, directly stated that he could see the addition and that it would be an eyesore.[35] In contrast, when the mayor questioned Ms. Horen at the city council hearing whether she was opposed to the aesthetics of the building, Ms. Horen stated that she was opposed to the "philosophical aesthetics of it all."[36] Moreover, when looking at the drawings submitted by ATT, included in the administrative record, the garage extension is merely a third garage door added onto a large house on a one acre lot located in a neighborhood "which is developed with very large residential structures."[37] As such, given that only one person, Mr. Nerenberg, stated that he could actually see the addition and gave a specific reason why he was aesthetically opposed to the garage expansion, the court concludes that. substantial evidence does not support the finding that the application was denied based on the aesthetic concerns.[38]

Turning to the issue of property values, the city specifically found that the site would negatively affect the property values of the nearby homes based upon the perceived fear of the health effects caused by the RF emissions.[39] However, the TCA prohibits local government from basing their decision to deny a permit to construct a wireless site upon evidence which finds its support in fear over the health

---

33. AR, Part IX, pp. 4, 25, 69–72 (discussions at the planning commission hearing concerning RF emissions from the site and the commission's ability to consider such emissions in deciding the permit application); Part VII, 20–21 (city attorney's advice to the city council concerning its ability to consider the RF emissions).

34. AR, IX, pp. 30–33, 49.

35. AR, Part IX, pp. 56–58; Part VII, pp. 24–26. In fact, the mayor commented that he had been to Cadencia street and could not tell that the Pac Bell site was anything other than a home. AR, Part VII, pp. 13–14. In comparison the ATT site is similarly designed in that the antennas are hidden under stucco attached to the chimneys and the radio base station is housed in a garage expansion.

36. AR, Part VII, pp. 19–20. Ms. Horen added that she was really concerned with the health affect and property values caused by siting wireless personal service facilities in the area. AR, Part VII, pp. 19–20.

37. AR, p. 346 (Planning Department Report to the Planning Commission, May 16, 2001).

38. The city also relied on the finding that neighbors objected the commercial-like garage addition since instead of a four-car garage it would be a six-garage. However, no resident testified that other homes had more or less garages. In fact, the only resident who stated that she thought the addition looked "commercial" added that she could not even see the extension when driving on the street. Accordingly, the finding about a "massive" garage being out of character seems to be nothing more than an attempt to restate that it was aesthetically displeasing, which, as discussed above, is not supported by substantial evidence.

39. AR, Part I, p. 8.

effects of RF emissions. H.R. Conference Report No. 104–458, 201 (1996). As such, the concern over property value depreciation based on fear over RF emissions does not constitute a legitimate basis for an application denial under the TCA. Additionally, no evidence exists in the record that property values will decline simply from the additions to the home.[40]

As to the "intensification of uses within the neighborhood," this finding is not supported by substantial evidence. First, neighbors expressed concern that the neighborhood would become "antenna alley" and that there would be a saturation of cell sites since the Pac Bell cell site and a ham radio, used by the property owner, were also located close to the proposed ATT site. The planning commission and city council reiterated this point by repeatedly expressing concerns that the neighborhood would become inundated with "five, six, seven of such facilities."[41] However, what is notably missing from the

record is any evidence to even suggest that a third or fourth company, much less numbers five, six and seven, were seeking to site in the area.[42] Moreover, the concern over "antenna alley" could not be aesthetic since the antennas and equipment at the site are designed to look like the house and thus could not be seen from the exterior. Second, the argument that a six-car garage is out of character with the neighborhood is not supported by the record because under the municipal code any home owner could expand his or her garage to be a six-car garage.[43] Residents stated concern over the area becoming "non-residential" and commercial due to the added cell sites. Yet, there simply is no evidence that the cell site would cause the area to look commercial since the site looks like a part of a large house in a neighborhood with very large houses[44] and there is no evidence that the trips or noise generated by the ATT site would be intrusive into the neighborhood.[45] In contrast to the lack of

**40.** Mr. Nerenberg testified that the additional garage will negatively affect his property values, but he presented no evidence to either the city council or planning commission to support this assertion. AR, Part VII, 26.

**41.** AR, Part VI, p. 6; Part IX, p. 79–81.

**42.** The city argues that ATT's RF engineer, Mr. Tech, admitted that another site would go within a mile of the proposed site. However, this misconstrues his testimony since his reference to a mile radius had to do with the coverage provided by the proposed site and not the distance between the proposed site and another site. AR, Part IX, p. 24.

**43.** The city does not contest that a home owner could expand his or her garage as a matter of right to house vehicles, but argues that ATT's "as-of-right" argument lacks merit because the extension is a nonconforming use which is not as of right. Reply in Support of Defendants' Cross–Motion for Summary Adjudication of Counts I and III, p. 7 n. 9. However, this argument misses the point since the issue, when the city states a six car garage is out of character with the neighborhood, is

not what is housed inside the garage but its exterior appearance in comparison to the neighborhood. Thus, because anyone in the neighborhood could expand to have a six car garage, which involves only three garage doors, the "out-of-character" argument lacks any evidentiary support.

**44.** The planning department report to the planning commission states, "The proposed project is located in a low density residential neighborhood which is developed with very large residential structures." AR, Part II, p. 346.

**45.** Residents were concerned over increased traffic and stated before the planning commission that they saw Pac Bell workers checking the green boxes located on the streets quite regularly. AR, Part IX, pp. 54–55; Part VII, p. 23. However, ATT made clear that no such green box was necessary to develop the proposed site, and the city planner testified that only one to two trips per month by ATT workers would occur to check on the site showing that any traffic increase would be minimal. AR, Part IX, pp. 64, 77. Additionally, while

evidence supporting the finding that ATT's site would commercialize the neighborhood, the testimony of the residents shed light on the true underlying concern over the neighborhood becoming "antenna alley" as illustrated by Ms. Horen's statements before the city council:

It's an emotional issue that people have, and even though we are not allowed to speak of health concerns, as you know, there are no long-term studies of low level radiation, the effects on the community. And so there is kind of a palpable fear and a concern about those issues and especially in this neighborhood which we now call antenna alley because we already got one that kind of slid in very quickly, and . . . [a]cross the street at 7535 there is a ham radio station . . . So now we're talking about across the street a new installment of AT & T.

AR, Part VII, p. 15. In sum, this underlying fear of "antenna alley" is not substantiated by any evidence in the record that other cellular providers will seek to locate in the neighborhood, and lacks any basis for concern other than detrimental health effects.

*Alternative Sites and Policy No. 64*

■ In addition to the lack of compatibility with the neighborhood, the city argues the lack of evidence "that alternative locations . . . have not been exhaustively explored,"[46] establishes substantial evidence to support the denial of ATT's per-

mit application. The pertinent question on this issue is whether or not the city imposed such criteria at the time of ATT's application since the city may not arbitrarily impose new CUP criteria not in place at the time of plaintiff's application. *See New Par v. City of Saginaw,* 301 F.3d 390, 398 (6th Cir.2002) (denial of variance based on criteria not part of relevant city ordinance does not constitute substantial evidence); *Group EMF, Inc. v. Coweta County,* 131 F.Supp.2d 1335, 1343 (N.D.Ga.2000) (county's denial of permit to build cell site due to applicant's failure to consider alternative cell sites was not supported by substantial evidence because the local ordinance imposed no such requirement); *Virginia Metronet, Inc. v. Board of Supervisors,* 984 F.Supp. 966, 974 n. 14 (E.D.Va.1998) ("In order be supported by substantial evidence, the proffered reasons must comport with the objective criteria in existence . . . Governing bodies cannot simply arbitrarily invent new criteria in order to reject an application.")

■ The city claims that ATT was required to demonstrate that no feasible alternatives in non-residential locations existed, pursuant to Policy No. 64, for a CUP to be granted. However, the criteria stated in Policy No. 64 is irrelevant because the administrative record contradicts any reasonable argument that Policy No. 64 was the guiding policy at the time ATT's application was complete.[47] First, Policy No. 64 was not written until almost a year

---

the issue of noise was raised, the planning department found that the noise would not be intrusive in addition to the fact that ATT agreed to insulate the faux garage to alleviate any concerns over noise. AR, Part IX, p. 64; Part VII, p. 30. As such, substantial evidence does not exist to support the proposition that ATT's proposed site would cause an intensification of uses that would "commercialize" the neighborhood.

**46.** AR, p. 29 (Resolution No.2001–309).

**47.** The city argues in its reply brief in support of its motion for summary adjudication, that

Policy No. 64 is merely a guideline for applying for a CUP suggesting that ATT could have received a CUP without following the "guidelines" set forth in the policy. Defendants' Reply in Support of Defendants' Cross–Motion for Summary Adjudication of Counts I and III, 5:17–27. This argument lacks merit given the city's contradictory statement that ATT's failure to show any feasible alternatives to the proposed site as required by Policy No. 64 constitutes substantial evidence supporting the denial. Defendants' Cross–Motion for Summary Adjudication of Counts I and III, 19:7–19.

after ATT's application was complete and two weeks after the city council denied ATT's application.[48] Second, Senior City Planner Christer Westman testified before the planning commission that the city lacked any policy that would guide the planning department in addressing the proliferation of cell site applications for residential neighborhoods.[49] In contrast, Policy No. 64 states that its purpose is to guide staff in reviewing the placement of cell sites including placement within residential neighborhoods.[50] Third, the city does not point to any evidence in the record that Policy No. 64 in fact memorializes existing city policy. Finally, findings in the city's resolution contradict that this written policy was in place at the time of the application since it imposes the requirement that no feasible alternative exist for a cell site to be placed in residential neighborhoods, yet the resolution denied the application for failing to exhaustively explore other residential and commercial sites.[51] Therefore, the city cannot rely on Policy No. 64 as a basis of substantial evidence to support the findings because to do so would impose criteria on ATT's application not in place when ATT completed the application process.

Apart from Policy No. 64, the city argues that the application failed to meet the relevant CUP criteria established by Carlsbad Municipal Code § 21.42.020 that the site be necessary or desirable for the development of the city.[52] Despite the General Plan's recognition that cell sites are "necessary and essential to the infrastructural support of urban land uses,"[53] the city found that the cell site was not necessary because ATT failed to exhaustively examine alternatives to avoid the intensification of uses in the proposed neighborhood and to sufficiently attempt to obtain a site at a commercial center to be built. However, these finding collapse in light of the fact that they are based on the city's concern over the intensification of uses in the neighborhood[54] which, in turn, lacks substantial evidence in support of such a finding (see discussion *supra*). Additionally, the city found that several residents testified to being subscribers to ATT and having adequate coverage in the area to be covered by the proposed site which the city now argues constitutes substantial evidence for showing that the site was neither necessary nor desirable. However, the record belies the argument that substantial evidence supports this finding. While several residents testified to having adequate cell phone coverage in the relevant area, a review of the record shows that only two residents stated they subscribed to ATT.[55] While the residents' statements are evidence that the city should consider, two statements that ATT does have adequate coverage does not reach the level of substantial evidence especially in light of the contrary testimony by ATT's engineer that a coverage gap exists in the area.[56] Therefore, substantial

**48.** AR, p. 345; Part VI, p. 1.

**49.** AR, IX, p. 63.

**50.** AR, p.12.

**51.** AR, p. 15; AR, p. 8.

**52.** Carlsbad Municipal Code § 21.42.020 states in relevant part:

A conditional use permit shall be granted only if the following facts are found to exist in regard thereto: (1) That the requested use is necessary or desirable for the development of the community."
Defendants' Reply in Support of Defendants' Cross–Motion for Summary Adjudication, Ex. B.

**53.** AR, p. 346.

**54.** AR, pp. 8, 9.

**55.** AR, Part IX, pp. 37, 41, 46, 51.

**56.** AR, IX, p. 24.

evidence does not support the findings that relate to the CUP criteria set forth in Carlsbad Municipal Code § 21.42.020.

In sum, having reviewed the administrative record the court cannot reasonably conclude that the evidence supporting the denial decision was substantial especially in light of the high degree of attention drawn to the concern over the health effects of RF emissions by the residents, planning commission, and city council. Therefore, the city's decision in denying ATT's applications violated § 332(c)(7)(B)(iii) and (c)(7)(B)(iv) and cannot stand.

*Equitable Estoppel*

 As an affirmative defense, the city argues that ATT should be equitably estopped from litigating the substantial evidence claim (47 U.S.C. § 332(c)(7)(B)(iii)count three) because ATT withheld relevant information from the city during the CUP process on the availability of alternative cell sites.[57] Such evidence, the city argues, would itself have established substantial evidence for denying plaintiff's application making equitable estoppel proper.

In order to prevail on a claim of equitable estoppel, the city must establish the following:

(1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true

facts; and (4) he must rely on the former's conduct to his injury.

*United States v. Georgia–Pacific Co.,* 421 F.2d 92, 96 (9th Cir.1970) (citation omitted); *TransWorld Airlines, Inc. v. American Coupon Exchange, Inc.,* 913 F.2d 676, 695 n. 19 (9th Cir.1990) (citations omitted). The city presents three facts that documents uncovered during discovery, but not presented during the application process, allegedly reveal: (1) ATT withheld a coverage map showing adequate coverage for the relevant area; (2) ATT identified alternative non-residential sites; and (3) ATT required a sister site to compliment the proposed site but the information was not disclosed. The city relies on the expert testimony of Jonathan Kramer in establishing the first two "known facts" in light of the documents produced by ATT. Consequently, because Kramer's testimony lacks reliability, the city has failed to meet its burden to establish that the first two facts are actually facts and thus cannot establish the first prong of the estoppel defense.[58]

On the third fact, the city's argument that ATT withheld information about a necessary sister site to the proposed site lacks evidentiary support. ATT's engineer did state before the planning commission that the proposed site would only cover a one-mile radius and that an additional site would be needed which is corroborated by the Gonsalves affidavit. However, the city mischaracterizes these statements by arguing that ATT required a second site in order to allow the proposed site to operate properly.[59] The city has presented no evi-

---

**57.** The city has filed a motion to amend its answer in order to include the estoppel defense. However, because the city has failed to carry its burden in establishing that equitable estoppel applies in this case, the court denies the city's motion to file a first amended answer.

**58.** The court rejects the city's argument that its estoppel defense is not dependent in any

way on Kramer's testimony since it is Kramer's "expert" analysis of the documents produced that the city uses to establish ATT had adequate coverage and viable alternative sites. *See* Defendants' Cross–Motion for Summary Adjudication of Counts I and III, 21:6–22:2.

**59.** AR, Part IX, 23:5–14

dence that the proposed site and sister site cannot function without the other. Rather, the undisputed evidence shows, as stated by Gonsalves, that the proposed site is not structurally dependent upon the building of another site.[60] In other words, the proposed site does not need an additional site to cover the one-mile radius it is intended to cover.[61] Accordingly, the city has failed to show that this last fact is "known" by ATT because it has not presented evidence that the fact, as it describes it, exists. Therefore, the city's estoppel argument fails because the city has not met its burden in establishing the elements of its affirmative defense.

### D. Administrative Mandamus

ATT requests that the court issue a writ of administrative mandamus based upon the city's violation of § 332(c)(7)[62] requiring that the city grant the application for the CUP. While the city argues that ATT has not shown that the remedies under the TCA are inadequate, this court follows the decisions laid down by a number of Circuits which have held that an injunction compelling the local authority to act is an appropriate remedy for a violation of § 332(c)(7). *See Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 497 (2d Cir.1999) (noting that a majority of district courts have held injunction appropriate to remedy a violation of the TCA and holding injunction imposed by district court appropriate since this best serves the purpose of the "TCA's stated goal of expediting this type of action."); *Preferred Sites, LLC v. Troup County*, 296 F.3d 1210, 1222 (11th Cir. 2002) (injunction appropriate remedy for violation of § 332(c)(7)); *Omnipoint Corp. v. Zoning Hearing Board of Pine Grove Township*, 181 F.3d 403, 410 (3d Cir.1999) (upholding injunction imposed by district court for violation of § 332(c)(7)(B)(iii) because "[i]njunctions are proper forms of relief under § 332(c)(7)(B)(v)")[63] (citation

---

**60.** Gonsalves Affidavit, 3:4–6.

**61.** The third fact, the need for an additional site, is also pertinent to the city's California Environmental Quality Act ("CEQA") argument. This argument lacks any merit given that the city has failed to establish that a second site will be environmentally significant " 'in that it will likely change the scope or nature of the initial project or its environmental effects.' " *Berkeley Keep Jets Over the Bay Comm. v. Bd. of Port Comm. Of the City of Oakland*, 91 Cal.App.4th 1344, 1360, 111 Cal. Rptr.2d 598 (2001) (*quoting Laurel Heights Improvement Ass'n v. Regents of Univ. of Calif.*, 47 Cal.3d 376, 396, 253 Cal.Rptr. 426, 764 P.2d 278 (1988)). Because the only interaction between the two possible sites is that they will cover the same area, there is no evidence that suggests that a second site will change the environmental impact of the first site other than causing more RF emissions which the city and state may not consider.

**62.** ATT also filed a motion for summary adjudication on count two (violation of § 332(c)(7)(B)(i)(I) prohibiting unreasonable

discrimination between providers of equivalent services). Because ATT seeks the essentially the same relief under count two as it does under counts one and three (injunctive and declaratory relief), the court need not address count two. However, the court notes that the lack of substantial evidence to support the denial of ATT's application giving rise to the conclusion that the city impermissibly based its decision on health effects also shows a violation of § 332(c)(7)(B)(i)(I) because no reasonable basis exists for granting Pac Bell's application for a CUP but denying the application submitted by ATT.

**63.** Section 332(c)(7)(B)(v) provides in part:

Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis.

47 U.S.C. § 332(c)(7)(B)(v).

omitted). The city argues that administrative mandamus is not appropriate because the city is working with ATT to find a feasible alternative site outside a residential area. However, such cooperation by the city is a result of its unlawful denial of ATT's permit application. Consequently, remanding the decision would allow the city to benefit from its unlawful decision and would frustrate the purpose of the TCA that actions brought under it be decided on an expedited basis. Therefore, administrative mandamus is appropriate in this case.

### E. Violation of Equal Protection ·

 In addition to its claims under the TCA, ATT argues that the city's actions violated ATT's right to equal protection under both the California and United States Constitutions.[64] The equal protection clause of the Fourteenth Amendment "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Even though local land use decisions are presumptively constitutional where no fundamental right or suspect class is involved, an equal protection violation will be found where the local government decision bears no rational relationship to a legitimate government interest. *Del Monte Dunes v. Monterey,* 920 F.2d 1496, 1508–09 (9th Cir.1990) (plaintiff stated an equal protection claim where complaint alleged that city unreasonably and arbitrarily limited use of plaintiff's property and required property

be set aside for open space without imposing such conditions and restrictions upon owners of similarly situated property). The city argues that it had a legitimate basis for discrimination because ATT had adequate coverage in the area, failed to exhaustively examine other possible sites, and was the third wireless site in the neighborhood whereas Pac Bell was the second. However, these arguments lack support since the court is convinced that the undisputed evidence shows that the city denied the application because of the public outcry over the possible health effects from RF emissions. Additionally, each of the alleged bases for discrimination lack support. First, ATT has submitted an unrebutted affidavit of Gonsalves, as well as the testimony of its engineer Mr. Tech, showing that ATT has poor to no coverage in the Cadencia area which is the same reason Pac Bell located in the area.[65] Second, the failure to explore alternative sites is not a legitimate basis for discrimination given that this is based on concerns of over-intensification, which, as discussed above, lacks evidentiary support leaving the court to conclude that the city denied the permit due the health effects issue. Moreover, to the extent that the city argues that Policy No. 64 requires examination of non-residential alternatives, such a basis is arbitrary and unreasonable since the policy was not in existence when ATT's application was completed, *supra.* Third, simply because ATT is the third wireless site in the area does not mean that its permit may be denied unless there is some rational basis for denying the application. Fourth, denying the permit because the garage extension is out of character with

---

**64.** Because ATT essentially analyzes its equal protection claim under the U.S. Constitution, the court applies federal law to ATT's claim.

**65.** Gonsalves Affidavit, ¶ 18. To the extent that the city relies on the expert testimony of

Jonathan Kramer to support the argument on coverage, the court does not take such testimony into account because of its unreliability, *supra.*

the neighborhood lacks evidentiary support since garage expansions are allowed as a matter of right under the municipal code, *supra.* Consequently, the city acted unreasonably by discriminating between the applications submitted by ATT and Pac Bell when it denied ATT's application without a legitimate basis and therefore violated ATT's rights under the Fourteenth amendment.

### F. Procedural Due Process

ATT argues that the city's policy of requiring no feasible alternatives prior to granting a CUP that would allow a cell site in a residential neighborhood is void for vagueness on its face and as applied to ATT. However, because the court has granted ATT's request for administrative mandamus requiring the city to grant CUP application 00–36, the court denies ATT's motion for summary judgment on this claim as it is moot.

### G. 42 U.S.C. § 1983

 To prevail on a § 1983 claim, the plaintiff must prove that (1) the defendant acted under the color of law in committing the conduct at issue and (2) such conduct deprived plaintiff of some right, privilege or immunity protected by the Constitution or laws of the United States. 42 U.S.C. § 1983; *Haygood v. Younger,* 769 F.2d 1350, 1354 (9th Cir.1985) (en banc).[66] Because the court finds that significant questions of fact and law remain as to whether the named defendants may be found liable

under § 1983, the court denies plaintiff's motion for summary judgment on this claim.[67]

## IV. CONCLUSION

For the foregoing reasons, the court **grants** ATT's motions for summary adjudication on counts one, two, three, eight, and ten, but **denies** ATT's motion for summary adjudication on count seven and nine. Furthermore, the court denies the city's cross-motion for summary adjudication on counts one and three and **denies** the city's motion to file a first amended answer.

**IT IS SO ORDERED.**

---

66. In addition to declaratory and injunctive relief, ATT seeks compensatory damages under the Federal Civil Rights based upon violations of its rights under the TCA. A number of courts have split on whether the TCA implicitly forecloses a suit for damages under § 1983. *See Nextel Partners Inc. v. Kingston Township,* 286 F.3d 687, 695 n. 7 (noting the split among district courts on whether the TCA forecloses a § 1983 action and holding that the TCA is sufficiently comprehensive to foreclose suit under § 1983). However, because

the court has set the § 1983 issue for further briefing, *see* n.69 *infra,* it does not address this issue at this time.

67. The court has requested, in a letter to be sent to the parties concurrently with this order, that the parties submit further briefing as to whether § 1983 liability may be imposed on the named defendants. The specific issues the court seeks to have addressed will be set forth in the letter.